**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL S. WIDUCK, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CARLOTZ, INC., MICHAEL W. BOR, and THOMAS W. STOLTZ, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Michael S. Widuck ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by CarLotz, Inc. ("CarLotz" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CarLotz; and (c) review of other publicly available information concerning CarLotz.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired CarLotz securities between December 30, 2020 and May 25, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     CarLotz operates a consignment-to-retail used vehicle marketplace where corporate vehicle sourcing partners and retail sellers of used vehicles can sell at prices that are, on average, below those of traditional dealerships.

3.     On or about January 21, 2021, CarLotz became a public entity via merger with Acamar Partners Acquisition Corp., a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

4.     On March 15, 2021, CarLotz announced its fourth quarter and full year 2020 financial results. During a related conference call, the Company stated that gross profit and gross profit per unit ("GPU") "were softer than . . . expected" due to "the surge in inventory during the

2

quarter and the resulting lower retail unit profitability." CarLotz also reported that the additional inventory "created a logjam that resulted in slower processing and higher days to sell."

5.     On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume. The stock price continued to decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

6.     On May 10, 2021, after the market closed, CarLotz announced its first quarter 2021 financial results revealing that gross profit per unit fell below expectations. In particular, the Company had expected retail GPU between $1,300 and $1,500, but reported $1,182.

7.     On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume. The stock price continued to decline $0.45, or 8%, to close at $5.12 per share on May 12, 2021, on unusually heavy trading volume.

8.     Then, on May 26, 2021, before the market opened, CarLotz announced an update to its profit-sharing sourcing partner arrangement. Specifically, CarLotz stated that its "profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company." Moreover, this partner "accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date.

9.     On this news, the Company's stock price fell $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.     Specifically, Defendants made material misrepresentations concerning the following: (1) that, due to a surge in inventory during the second half of fiscal 2020, CarLotz was experiencing a "logjam" resulting in slower processing and higher days to sell; (2) that, as a result, the Company's gross profit per unit would be negatively impacted; (3) that, to minimize returns to the corporate vehicle sourcing partner responsible for more than 60% of CarLotz's inventory, the Company was offering aggressive pricing; (4) that, as a result, CarLotz's gross profit per unit forecast was likely inflated; (5) that this Company's corporate vehicle sourcing partner would likely pause consignments to the Company due to market conditions, including increasing wholesale prices; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the

alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.    Plaintiff Michael S. Widuck, as set forth in the accompanying certification, incorporated by reference herein, purchased CarLotz securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant CarLotz is incorporated under the laws of Delaware with its principal executive offices located in Richmond, Virginia. CarLotz's Class A common stock trades on the NASDAQ exchange under the symbol "LOTZ" and its redeemable warrants on the NASDAQ exchange under the symbol "LOTZW."

18.    Defendant Michael W. Bor ("Bor") was the Chief Executive Officer ("CEO") of CarLotz at all relevant times.

19.    Defendant Thomas W. Stoltz ("Stoltz") was the Chief Financial Officer ("CFO") of CarLotz at all relevant times.

20.    Defendants Bor and Stoltz (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants

were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.    CarLotz operates a consignment-to-retail used vehicle marketplace where corporate vehicle sourcing partners and retail sellers of used vehicles can sell at prices that are, on average, below those of traditional dealerships.

### Materially False and Misleading
### Statements Issued During the Class Period

22.    The Class Period begins on December 30, 2020.  On that day, the Company filed its Prospectus on Form 424B3.  Regarding inventory build-up, the Company stated:[1]

> In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. COVID-19 impacted both sales and inventory count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. As wholesale prices skyrocketed, we used our asset-light, non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth. ***Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1,***

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

> *2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.*

23.    Moreover, the Prospectus stated that "[i]f we are unable to operate our processing centers efficiently, we *could* experience delivery delays, a decrease in the quality of our reconditioning services, *delays in listing our inventory*, *additional expenses and loss of potential and existing corporate vehicle sourcing partners* and retail sellers and subsequent revenues, which *may* materially and adversely affect our business, financial condition and results of operations."

24.    The Prospectus stated that "[f]or the nine months ended September 30, 2020, three of our corporate vehicle sourcing partners, with whom we do not have long term consignment contracts, accounted for 49% of the cars we sold."  CarLotz further stated that "[f]or the six months in the period ended November 30, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 50% of the cars we sold and more than 50% of our revenues during this period was derived from the sale of these cars."

25.    As to gross profit, the Company stated in the Prospectus that retail gross profit per unit increased "to $1,900 per unit for the nine months ended September 30, 2020 . . . driven by a shift in the sale of owned units to consigned units."  However, CarLotz stated that its gross profit per vehicle could "fluctuate from period to period" due to the Company's "alternative fee arrangements with certain of [its] corporate vehicle sourcing partners."  Specifically, CarLotz stated in the Prospectus:

> In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. *Under these sharing arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our*

*flat fee pricing model depending on the unit's sale price and fees we are able to charge in connection with the sale.* As we do not have binding long term contracts with our corporate vehicle sourcing partners and do not require them to make vehicles available to us, our mix of vehicles sourced under alternative fee arrangements is likely to fluctuate over time. Our gross profit per unit is therefore likely to fluctuate from period to period, perhaps significantly, due to our sourcing partner mix as well as due to the sales prices and fees we are able to collect on the vehicles we source under alternative fee arrangements.

26.    The above statements identified in ¶¶ 22-25 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants made material misrepresentations concerning the following: (1) that, due to a surge in inventory during the second half of fiscal 2020, CarLotz was experiencing a "logjam" resulting in slower processing and higher days to sell; (2) that, as a result, the Company's gross profit per unit would be negatively impacted; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

27.    The truth began to emerge on March 15, 2021 when CarLotz stated that its profits were impacted by the surge in inventory during the fourth quarter.    Specifically, the Company held a conference call in connection with the release of its fourth quarter and full year 2020 financial results.    During the call, Defendant Stoltz stated that profits were impacted by "the surge in inventory during the quarter and the resulting lower retail unit profitability, as a result of slower sell-throughs and more vehicles wholesaled."    Similarly, Defendant Bor stated that "[t]he additional inventory that we secured to drive our growth put pressure on our processing centers and created a logjam that resulted in slower processing and higher days to sell," and Defendant Stoltz stated that as a result, gross profit and GPU "increased 25%, but were softer than we expected."

8

28.     On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume.  The stock price continued to decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

29.     However, during the same conference call, Defendant Bor assured that Defendants "***are remediating*** [these issues] through increased staffing, enhanced leadership, and process improvements."  Defendant Stoltz also stated that "[a]s we work through this excess inventory, a large majority of what we're selling right now is this profit share program and as we get our inventory levels more in line with where they should be based on the demand in our existing hubs, we will see the GPU improve substantially on that front."  Similarly, during the conference call, Defendant Stoltz went on to assure that CarLotz "expect[s] our flow of inventory to better match demand now through the balance of this year."  He further stated:

> In the meantime, we expect the higher than ideal inventory levels that we saw earlier this year in our existing hubs to impact our first quarter 2021 gross profit and second quarter to a lesser extent, which impacts our full-year gross profit and GPU guidance.

30.     The same day, CarLotz filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K").  Regarding sourcing partners, the 2020 10-K stated:

> ***One or more of our corporate vehicle sourcing partners may represent 10% or more of our total vehicles consigned, and at times significantly more, in the normal course of our vehicle sourcing.***
>
> One or more of our corporate vehicle sourcing partners will often represent 10% or more of the vehicles we source over a particular period. For example, during the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. ***Furthermore, for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing***

***partners has accounted for over 60% of our vehicles sourced.*** Over time, we may have concentrations of 10% or more for a number of reasons, and the concentrations will often vary among corporate vehicle sourcing partners. Some corporate vehicle sourcing partners may make a supply of vehicles available at certain times of a given year, while others may increase or decrease their flow of vehicles for a number of reasons, including the performance of their business or prevailing business considerations and economic conditions.

Furthermore, at times, we may source a significantly higher portion of our consigned vehicles from one or more corporate vehicle sourcing partners. Such concentrations can result from a variety of factors, some of which are beyond our control. During any given time period, we may elect to source a higher percentage of vehicles from one or more corporate vehicle sourcing partners for a variety of reasons, including the availability of specific vehicle makes and models.

Sourcing a significant portion of our consigned vehicles from a limited number of corporate vehicle sourcing partners exposes us to a number of risks*. **Our agreements with our corporate vehicle sourcing partners are generally subject to cancellation by either party upon 30 to 90 days' notice.*** Generally, corporate vehicle sourcing partners make non-binding long-term commitments to us regarding consignment volumes. ***If a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles were to cease or significantly reduce making vehicles available to us, it could adversely affect our business, financial condition and results of operations as we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions.*** Such an effort may take a number of months and may not precisely replicate the variety and quality of vehicles we have been sourcing from this single source. Further, we could be required to increase our purchasing of vehicles to maintain optimal inventory levels and mix as we work to increase vehicle supply from other vehicle sourcing partners, which could negatively affect our margins and gross profit per vehicle. Furthermore, having a high concentration of vehicles in our inventory on consignment from a single corporate vehicle sourcing partner could indirectly expose us to credit risk with respect to that corporate vehicle sourcing partner as we may be restricted from selling those vehicles or realizing profits on the sale of those vehicles in the event of that corporate vehicle sourcing partner's insolvency.

(First emphasis in original.)

31.     Furthermore, the 2020 10-K stated that GPU could decline due to the nature of fee arrangements with the Company's corporate vehicle sourcing partners.  Specifically, it stated:

> For the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners with whom we have an alternative fee arrangement has accounted for over 60% of our vehicles sourced. Under our fee arrangement with this corporate vehicle sourcing partner, vehicles are returned to the corporate vehicle sourcing partner from consignment if the vehicle has not been sold through our retail channel within a specified time period. In such instances, we are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred. ***We have returned a number of vehicles from consignment during the first quarter of 2021 to date and expect to continue to return vehicles into the second quarter of 2021 as we seek to better match our intake of vehicles under this arrangement to our sales and reconditioning capacity. The expenses associated with these returned vehicles will reduce our gross profit during the first quarter of 2021 and for subsequent periods during which we experience such vehicle returns.***

32.     The above statements identified in ¶¶ 27, 29-31 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants made material misrepresentations concerning the following: (1) that, to minimize returns to the corporate vehicle sourcing partner responsible for more than 60% of CarLotz's inventory, the Company was offering aggressive pricing; (2) that, as a result, CarLotz's gross profit per unit forecast was likely inflated; (3) that this corporate vehicle sourcing partners would likely pause consignments to the Company due to market conditions, including increasing wholesale prices; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

33.     On May 10, 2021, after the market closed, CarLotz announced its first quarter 2021 financial results revealing that gross profit per unit fell below expectations.  In a press release, the Company stated, in relevant part:

The following compares our first quarter results to our previously provided first quarter guidance:

| | Guidance | Results | |
|---|---|---|---|
| New Hub Openings | Three | Three | Met Expectations |
| Retail Units Sold | 1,900 to 2,100 | 2,554 | Exceeded Expectations |
| Net Revenue | $42 to $46 million | $56.6 million | Exceeded Expectations |
| Gross Profit | $1.6 to $2.0 million | $2.0 million | Met Expectations |
| Retail Gross Profit per Unit ("Retail GPU") | $1,300 to $1,500 | $1,182 | Below Expectations |
| SG&A Expenses | $17 to $19 million | $18.9 million, excluding non-cash stock compensation expense of $42 million | Met Expectations |
| Net Loss | $(16) to $(15) million | $(15) million | Met Expectations |

34.     The same day, the Company held a conference call to discuss the results.  During the call, Defendant Stoltz stated "gross profit and retail GPU both decreased year-over-year as a result of the carryover of Q4 excess inventory as related to our profit share account."  He assured that CarLotz had "cleared substantially all of this aged inventory in the quarter ahead of schedule with aggressive pricing rather than absorbing shipping and reconditioning costs on vehicles returns to the client. While this negatively impacted our retail GPU in the quarter, we did achieve the high end of our gross profit guidance by selling more of these units late in the quarter."  Though CarLotz claimed that its retail GPU would "improve," Defendant Bor stated that the Company decided "not to give specific guidance," raising doubts about the Company's visibility into gross profit for the remainder of the fiscal year.

35.     On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume. The stock price continued to decline $0.45, or 8%, to close at $5.12 per share on May 12, 2021, on unusually heavy trading volume.

36.     The above statements identified in ¶¶ 33-34 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants made material misrepresentations

concerning the following: (1) that one of the Company's corporate vehicle sourcing partners, responsible for more than 60% of the Company's inventory, would pause consignments to the Company due to market conditions, including increasing wholesale prices; and (2) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

37.    On May 26, 2021, before the market opened, CarLotz announced an update to its profit-sharing sourcing partner arrangement.  Specifically, CarLotz stated that its "profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company."  Moreover, this partner "accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date.  As a result, CarLotz lowered its fiscal 2021 outlook:

> ### Updated 2021 Outlook
>
> The Company is updating its 2021 outlook and financial guidance and comments with respect to its expected second quarter 2021 performance previously provided on May 10, 2021 as a result of:
>
> - the current business climate, as impacted by the lack of vehicles from this profit-sharing account, coupled with the unpredictable timeline of the chip shortage for new cars and its impact on the wholesale and retail automotive markets; and
>
> - the slippage in certain hub openings to later than previously expected.
>
> For the full year 2021, the Company expects the following results. This 2021 outlook assumes that, in the second quarter of 2021, the Company will sell greater than 2,000 retail units and will achieve a gross profit per unit of at least $1,800.

| New Hub Openings | 14 to 16 hub openings, most of which are expected to open in the back half of the year |
|---|---|
| Retail Units Sold | 13,000 to 15,000, which represents more than a 100% increase over 2020 retail units sold |
| Net Revenue | $272 to $317 million, which represents more than a 125% increase over 2020 net revenue |
| Gross Profit | $20 to $26 million, which represents more than a 75% increase over 2020 gross profit |
| Retail GPU | $1,650 to $1,850 |
| SG&A Expenses | $98 to $102 million, excluding non-cash stock compensation expense expected to be approximately $52 million |
| Adjusted EBITDA* | $(82) to $(72) million |
| Weighted Average Common Stock Shares Outstanding | 111 million shares |
| Capital Expenditures | $45 to $50 million |

38.    On this news, the Company's stock price fell $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired CarLotz securities between December 30, 2020 and May 25, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CarLotz's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of CarLotz shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may

be identified from records maintained by CarLotz or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CarLotz; and

        c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for CarLotz's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, CarLotz's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CarLotz's securities relying upon the integrity of the market price of the Company's securities and market information relating to CarLotz, and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CarLotz's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about CarLotz's business, operations, and prospects as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CarLotz's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at

artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

48.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49.     During the Class Period, Plaintiff and the Class purchased CarLotz's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding CarLotz, their control over, and/or receipt and/or modification of CarLotz's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CarLotz, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

51.     The market for CarLotz's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, CarLotz's securities traded at artificially inflated prices during the Class Period.  On January 21, 2021, the Company's share price closed at a Class Period high of $12.30 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CarLotz's securities and market information relating to CarLotz, and have been damaged thereby.

52.     During the Class Period, the artificial inflation of CarLotz's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CarLotz's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of CarLotz and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

53.     At all relevant times, the market for CarLotz's securities was an efficient market for the following reasons, among others:

a)     CarLotz shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

18

b)      As a regulated issuer, CarLotz filed periodic public reports with the SEC and/or the NASDAQ;

c)      CarLotz regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)      CarLotz was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for CarLotz's securities promptly digested current information regarding CarLotz from all publicly available sources and reflected such information in CarLotz's share price.  Under these circumstances, all purchasers of CarLotz's securities during the Class Period suffered similar injury through their purchase of CarLotz's securities at artificially inflated prices and a presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment

decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CarLotz who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

57.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase CarLotz's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CarLotz's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CarLotz's financial well-being and prospects, as specified herein.

61.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CarLotz's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CarLotz and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CarLotz's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CarLotz's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired CarLotz's securities during the Class Period at artificially high prices and were damaged thereby.

65.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CarLotz was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CarLotz securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.     Individual Defendants acted as controlling persons of CarLotz within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, CarLotz and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 20, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Thomas H. Przybylowski
600 Third Avenue
New York, New York 10016

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, *Michael S Widuck*                    , make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against CarLotz, Inc. ("CarLotz" or the "Company")

and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire CarLotz securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or

Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors

who purchased or otherwise acquired CarLotz securities during the class period, including

providing testimony at deposition and trial, if necessary. I understand that the Court has the

authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in CarLotz securities during the

Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under

the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf

of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


Executed    7-16-21
            **(Date)**


**(Signature)**


Michael S Widuck
            **(Type or Print Name)**

**CarLotz, Inc. (LOTZ)**                                                     **Widuck, Michael**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/16/2021 | 100 | $8.6450 |
| Purchase | 3/16/2021 | 478 | $8.6500 |
| Purchase | 3/16/2021 | 571 | $8.7500 |
| Purchase | 3/24/2021 | 641 | $7.7900 |
| Purchase | 4/12/2021 | 671 | $7.7200 |
| Sale | 4/7/2021 | (641) | $8.0600 |